UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EUGENE SCALIA, Secretary of Labor, )<br>United States Department of Labor, )<br>  )<br>  Petitioner,  )<br>  )<br>v.  )<br>  )<br>UHS OF FULLER, INC. and UHS  )<br>OF DELAWARE, INC.,  )<br>  )<br>  Respondents.  ) | Misc. Action No.<br>19-91541-FDS |

**REPORT AND RECOMMENDATION ON PETITION FOR
ENFORCEMENT OF ADMINISTRATIVE SUBPOENA DUCES TECUM[1]**

July 8, 2020

DEIN, U.S.M.J.

## I. INTRODUCTION

The Occupational Safety and Health Act of 1970 (the "OSH Act") authorizes the Secretary of Labor to conduct health and safety inspections of worksites, and to issue related citations. See 29 U.S.C. §§ 651 *et seq.* The Secretary acts through the Department of Labor's Occupational Safety and Health Administration ("OSHA"). See id. § 652. The Secretary and OSHA are referred to interchangeably herein. By this action, the Secretary is seeking to enforce a subpoena issued by OSHA as part of an inspection into workplace conditions at Fuller Hospital

---

[1] Although a motion to quash is a usually a non-dispositive matter, judges in this district have held that motions to enforce or quash administrative subpoenas are dispositive motions for purposes of review because they are the entire proceeding before the court. See, e.g., In re Admin. Subpoena Blue Cross Blue Shield of Mass., Inc., 400 F. Supp. 2d 386, 389 (D. Mass. 2005).

in South Attleboro, Massachusetts (the "Subpoena").  The Subpoena is directed to UHS of Delaware, Inc. ("UHS-Delaware") and UHS of Fuller, Inc. ("UHS-Fuller") (collectively "Fuller" or the "Respondents").[2]  Specifically, the Secretary is seeking to enforce Subpoena Request 5, which asks the Respondents to produce "[v]ideo surveillance footage depicting the incidents of workplace violence and/or patient aggression that resulted in employee injuries" that occurred between June 12, 2019 (the date on which Respondents were placed on notice by OSHA that they needed to preserve such video) and "the present."  (OSHA Resp. at 2).[3]  The Respondents were ordered to preserve these videos by the District Judge on January 6, 2020.  (Transcript (Docket No. 17) at 18).

The Respondents oppose the production of the video surveillance on the grounds that OSHA purportedly lacks authority to issue the subpoena, the production of the videos would violate patients' confidentiality rights under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its regulations relating to patients receiving substance abuse treatment, and that the request "to the present" is too broad.  While the Respondents argue the subpoena should be quashed in its entirety, they contend further that if any production is allowed it should be limited to videos that already existed as of September 24, 2019, the date

---

[2] Respondents contend that UHS of Delaware, Inc. and UHS of Fuller, Inc. are two separate entities, and that UHS of Delaware, Inc. provides administrative services to Fuller Hospital, while UHS of Fuller is responsible for the day-to-day operations of the hospital, including workplace policies and employee safety.  See "Memorandum of Law in Support of Respondents' Opposition to Petitioner's Petition to Enforce Administrative Subpoena Duces Tecum" ("Resp. Opp.") (Docket No. 21-1) at 2-3.  The Secretary contends that Fuller Hospital is operated by both entities.  See "Secretary's Response to Respondents' Answer & Memorandum (ECF Nos. 21 & 21-1)" ("OSHA Resp.") (Docket No. 27) at 7.  These differences do not have to be resolved here as the Subpoena was issued to both entities.

[3] In his Response, the Secretary confirmed that he is no longer seeking to enforce any other provisions of the subpoena.  (See OSHA Resp. at 2, n.3).

of the subpoena, that OSHA should provide written assurances of compliance with HIPPA regulations, and that OSHA should hire a company to scrub identifying images from the videos, at OSHA's expense. (See Resp. Opp. at 14). In response, the Secretary has proposed a protocol for identifying responsive videos and for addressing any legitimate privacy concerns. (See OSHA Resp. at 2-3).

After careful consideration, this Court concludes that the Respondents' objections are without merit. This Court recommends to the District Judge to whom this case is assigned that the Respondents be compelled to produce the videos in accordance with the Secretary's proposed protocol as modified slightly herein, and that, for the reasons detailed herein, the production cover the time period from June 12, 2019 through one month prior to the date of the actual production of the videos.

## II. STATEMENT OF FACTS

### Background

As described by the Respondents, Fuller Hospital is a 102-bed private psychiatric facility in South Attleboro, Massachusetts. (See Resp. Opp. at 2). It provides psychiatric services to both adults and adolescents. (Id.). Patients with dual diagnosis psychiatric and substance abuse disorders receive treatment there, although the record is not clear as to whether substance abuse treatment patients are housed separately.[4] Fuller Hospital is subject to HIPAA

---

[4] According to the Respondents, dual diagnosis patients can be treated on most units. Rep. Opp. at 2. According to the Secretary, only one of six patient care units at Fuller is designated to treat substance abuse patients. (OSHA Resp. at 11).

privacy regulations and to additional protections for patient records of substance abuse programs detailed in 42 C.F.R. Part 2 ("Part 2 Programs").

**Procedural Background**

According to the Petition ("Pet.") (Docket No. 1), on May 3, 2019, OSHA received a complaint that staff at UHS-Fuller were exposed to workplace violence, including the assault of staff members by patients. (Pet. ¶ 2). On June 12, 2019, OSHA opened an inspection of the working conditions at Fuller Hospital. (Id. ¶ 11). At that time, the Secretary issued an evidence preservation letter requesting that the Respondents preserve evidence relating to workplace violence at Fuller Hospital, including video surveillance. (Docket No. 1-10). On September 27, 2019, as part of that inspection, OSHA served the Subpoena on the Respondents seeking various categories of documents, as well as "[v]ideo surveillance footage depicting the incidents of workplace violence and/or patient aggression that resulted in employee injuries" "for the period of June 12, 2019 through the present[.]" (Pet. ¶¶ 12-13). Although the Subpoena directed the Respondents to appear and produce the requested material at the OSHA Boston South Area Office in Braintree, Massachusetts on October 8, 2019, the Respondents neither appeared nor produced any materials. (Id. ¶¶ 14-15). Instead, on that date UHS-Del. filed a motion to quash the Subpoena in the United States District Court for the Eastern District of Pennsylvania, which was subsequently joined by UHS-Fuller. (Id. ¶¶ 17-18).

The Secretary opposed the motion to quash and cross-moved to dismiss on the grounds that the Court lacked subject matter jurisdiction to consider an administrative subpoena prior to the Secretary seeking to enforce that subpoena. (Id. ¶ 19). While the matter was pending in the Eastern District of Pennsylvania, on December 10, 2019 the Secretary commenced the

instant case by filing the Petition, along with a supporting memorandum.  ("OSHA Mem.") (Docket No. 1-3).  In these filings the Secretary expressed concern that the requested documents and video tapes were not being preserved.  (See, e.g., Pet. ¶¶ 23-28).  On December 17, 2019, the Respondents moved to dismiss the Petition for failure to state a claim upon which relief can be granted or, in the alternative, to transfer this action to the Eastern District of Pennsylvania.  (Docket No. 6).  On January 21, 2020, the Eastern District of Pennsylvania transferred the motion-to-quash action to this court, where it is pending as a related action -- Misc. Action No. 20-91102-FDS.

Oral argument on the motion to dismiss was held before the District Judge on January 6, 2020. (Docket No. 14).  At that time the Respondents were ordered to preserve "any existing video surveillance, footage, responsive to the request Number 5" of the Subpoena.  (Transcript at 18).  On January 30, 2020, the District Judge issued a "Memorandum and Order on Respondents' Motion to Dismiss or, in the Alternative, to Transfer."  ("Opinion") (Docket No. 20).  The Court denied both the request to dismiss, and the request to transfer the case back to Pennsylvania.  (Id. at 7).  Thereafter, the Respondents filed their answer to the Petition (Docket No. 21) and their memorandum in Opposition to the Petition (Resp. Opp.) (Docket No. 21-1). The Secretary filed his Reply/Response (OSHA Resp.) (Docket No. 27) further addressing the merits of the Petition, and the Respondents filed a Sur-Reply (Resp. Sur- Reply) (Docket No. 37). This court subsequently heard oral argument.  (Docket No. 41).

Additional facts will be provided below where appropriate.

### III. ANALYSIS

In its opposition to the Petition, the Respondents argue that the Secretary lacks authority to issue the Subpoena for the video surveillance, that the production of the video is precluded by HIPAA and related regulations, and that the request itself is too broad. For the reasons detailed herein, this court concludes that the Respondents' arguments are without merit.

#### A. The Secretary is Authorized to Seek the Video Surveillance

The Respondents argue that the video surveillance constitutes patient medical records, and that while OSHA may review employee medical records under some circumstances, it is not entitled to view any patient medical records except "under the bloodborne pathogen standard, in order to determine whether a patient was the source of a transmission of HIV, HBV, or other bloodborne pathogens[.]" (Resp. Opp. at 7). Respondents argue further that while OSHA may review some employee medical records, such a review is limited to specific types of records and requires prior consent from the employee. (Id. at 6-7). The basis for the Respondents' position is its contention that "[n]owhere in the OSH Act or its implementing regulations does it provide that OSHA may inquire into the quality of medical care, clinical management of patients, or second-guess admission criteria of patients in hospital settings, even for workplace violence investigations." (Id. at 6). The Respondents have cited no cases in support of its reading of the OSH Act or applicable regulations, and none have been found. In any event, as detailed herein, any privacy concerns can be addressed by blurring patients' faces in the videos.

[6]

**Statutory Authority to Investigate Workplace Violence**

The "purpose and policy" of the OSH Act is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources[.]" 29 U.S.C. § 651(b). Section 5(a) of the OSH Act provides that "each employer—

> (1) shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees; [and]
>
> (2) shall comply with occupational safety and health standards promulgated under [the OSH Act].

Id. § 654(a). The Secretary is authorized to conduct inspections, compel testimony of witnesses and order the preservation and production of evidence, by, among other things issuing subpoenas. Id. § 657. If the Secretary, upon inspection or investigation, believes that a violation of the requirements of 29 U.S.C. § 654 has occurred, the Secretary may issue a citation. Id. § 658.

While the Respondents challenge the Secretary's authority to obtain the video surveillance at issue here, they do not dispute that the Secretary has authority to investigate claims of violence in the workplace. (See Resp. Opp. at 5-9). Thus, "[t]he OSH Act imposes two distinct duties on employers. First, employers must comply with specific workplace health and safety standards established by OSHA . . . [and] the Act grants OSHA authority to promulgate such standards." U.S. v. Sturm, Ruger & Co., Inc., 84 F.3d 1, 4 (1st Cir. 1996) (internal citation omitted). "Second, to fill whatever gaps may exist after rules delineating specific standards have been promulgated, the Act imposes on employers a general duty to provide 'employment and a place of employment which are free from recognized hazards.'" Id. (citing 29 U.S.C. §

[7]

654(a)(1)). It is generally recognized that the Secretary may issue a citation for a violation of this "general duty clause" where "'(1) an activity or condition in the employer's workplace presented a hazard to an employee, (2) either the employer or the industry recognized the condition or activity as a hazard, (3) the hazard was likely to or actually caused death or serious physical harm, and (4) a feasible means to eliminate or materially reduce the hazard existed.'" SeaWorld of Fla., LLC v. Perez, 748 F.3d 1202, 1207 (D.C. Cir. 2014) (quoting Fabi Constr. Co. v. Sec'y of Labor, 508 F.3d 1077, 1081 (D.C. Cir. 2007) (additional citation omitted)). The instant workplace violence investigation is being undertaken pursuant to the "general duty" clause.

Protecting employees at an inpatient psychiatric treatment facility from patient aggression qualifies as a recognized hazardous condition or activity entitling the Secretary to conduct an investigation pursuant to the general duty clause and issue a citation if appropriate. See BHC Nw. Psychiatric Hosp., LLC v. Sec'y of Labor, 951 F.3d 558, 560-61 (D.C. Cir. 2020) (upholding citation issued to a facility owned by Universal Health Services, Inc., and managed by UHS of Delaware, Inc.).[5] In fact, as the Respondents recognize, the Secretary has issued an Instruction which provides "policy guidance and procedures to be followed when conducting inspections and issuing citations related to occupational exposure to workplace violence."

---

[5] Apparently the Secretary has litigated several cases against UHS-Delaware and other UHS affiliates relating to claims of workplace violence. (See OSHA Resp. at 6-7 and cases cited). In several of those cases, the UHS entity produced video surveillance. (Id. at 8). According to the Secretary, however, there are a number of other situations where the UHS entity has allowed video surveillance to be destroyed. (See OSHA Mem. at 7-9). The Respondents object to the reference to these other cases, arguing that these other cases "involve different hospitals and thus different legal entities, and those facts of those litigations are not before this court to even make a proper comparison." (Resp. Sur-Reply at 3). Without ruling on whether those other cases may be considered as a matter of law, this court finds the present record sufficient to require the enforcement of the requested Subpoena, and will not consider the facts of other cases.

OSHA Instruction "Enforcement Procedures and Scheduling for Occupational; Exposure to Workplace Violence," CPL 02-01-058 (eff. 01/10/17) (Docket No. 21-8) ("Instruction").  Therein, healthcare is expressly identified as an industry "with a high incidence of workplace violence" (id. at 3) and violence directed at employees by patients is listed as among the most common types of violence covered by the Instruction.  Id. at 6-7.  Installing video surveillance is expressly identified as a method by which employers may abate the hazards of workplace violence.  Id. at Appendix A

### Authority to Request Copies of Video Surveillance

As noted above, the OSH Act authorizes the Secretary to issue administrative subpoenas, including during inspections.  29 U.S.C. § 657(b).  The subpoena "may require the attendance and testimony of witnesses and the production of evidence under oath."  Id.  United States District Courts have jurisdiction to enforce the subpoena if the employer fails or refuses to respond to the subpoena.  Id.  As the First Circuit has explained:

> The requirements for enforcement of an administrative subpoena are not onerous.  In order to obtain judicial backing the agency must prove that (1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose and (3) adequately described, and (4) proper procedures have been employed in issuing the subpoena. . . .  These standards apply to OSHA subpoenas in exactly the same way that they apply to subpoenas issued by other agencies.

Sturm, Ruger & Co., 84 F.3d at 4 (internal citations omitted).  "As long as the agency's assertion of authority is not obviously apocryphal, a procedurally sound subpoena must be enforced."  Id. at 5-6.

There can be no question that surveillance videos can be relevant to the authorized purpose of investigating incidents of workplace violence.  The Respondents argue that "the

secretary's supposed need for the video evidence sought is overstated" given that the factual information about incidents of violence can be obtained from other written documents and reports, including mandatory reports.  (See Resp. Sur-Reply at 7-8).  The Secretary, in turn, argues that video surveillance can be extremely compelling.  (See OSHA Resp. at 9).  It is not up to this court to determine what type of evidence is most persuasive – the court's inquiry is limited, as detailed above, to determining whether the subpoena was appropriately issued and seeks information that is "relevant."  Since video surveillance can depict incidents of workplace violence it is relevant.

### OSHA's Instruction

OSHA's Instruction relating to workplace violence provides in part as follows:

C.  Photographing or Videotaping

Where practical, photographing or videotaping shall be used for case documentation.  Under no circumstances will CSHOs [compliance safety and health officers] photograph or videotape patients, residents, inmates and prisoners.  CSHOs must also take all necessary precautions to protect patient confidentiality.

Instruction (Docket No. 21-8) at ECF p. 23/54.  Ignoring the first sentence completely, the Respondents argues that the "request for video of incidents of patient aggression toward Fuller Hospital employees . . . is clearly contrary to its own enforcement guidance[.]"  (Resp. Opp. at 8).  However, as the first sentence makes clear, existing videotapes are supposed to be used to document claims of workplace violence.  That is consistent with the rest of the Instruction which recommends that facilities use video surveillance for the safety of their employees.  No CSHO was at all involved in the requested videotaping at Fuller.  The Respondents reading of the Instruction as somehow prohibiting the Secretary from seeking the production of the

[10]

videotapes is without any merit. In short, the Respondents' contention that the request for videotapes is "beyond the scope of the OSH Act" must fail. (See Resp. Opp. at 9).

### B. HIPAA Does Not Prohibit the Product of the Videotapes

The Respondents next argue that while HIPAA does not prohibit OSHA from gaining information about employees, it bars OSHA from gathering "patient records," including videotapes, which disclose patients' identities without their prior approval. (See Resp. Opp. at 9-10). The Respondents cite no support for this distinction, and none has been found.

As the Respondents recognize, under HIPAA, a "covered entity" such as Fuller "may use or disclose protected health information" to a "public health authority." 45 C.F.R. § 164.512(b). The Respondents further recognize that OSHA qualifies as such an agency. Resp. Opp. at 9; see 65 Fed Reg. 82492 (listing OSHA and the EPA as "examples of oversight agencies that conduct oversight of government regulatory programs for which health information is necessary for determining compliance with program standards"), 82624 ("OSHA . . . and [its] state equivalents are public health authorities when carrying out their activities related to the health and safety of workers."). While the Respondents recognize that as a result of these provisions, OSHA is "unaffected by the HIPAA privacy rule" it limits OSHA's exemption from the privacy rules to "employee medical record." (Resp. Opp. at 9-10). The Respondents cite to no such limitation in the applicable regulations and none have been found. Thus, the HIPAA privacy rules do not prevent the Secretary from obtaining the videotapes reflecting workplace violence.

**Part 2 Restrictions**

Additional HIPAA regulations and limitations on disclosure apply to substance use disorder patient records.  See Confidentiality of Substance Use Disorder Patient Records, 42 C.F.R. §§ 2.11-2.23.  As detailed therein, the restrictions

apply to any information, whether or not recorded, which:

(i) Would identify a patient as having or having had a substance abuse disorder either directly, by reference to publicly available information, or through verification of such identification by another person; and

(ii) Is drug abuse information obtained by a federally assisted drug abuse program after March 20, 1972 (part 2 program), or is alcohol abuse information obtained by a federally assisted alcohol abuse program after May 13, 1974 (part 2 program); or if obtained before the pertinent date, is maintained by a part 2 program after that date as part of an ongoing treatment episode which extends past that date; for the purpose of treating a substance use disorder, making a diagnosis for that treatment, or making a referral for that treatment.

Id. § 2.12(a)(1).  "Patient identifying information" is defined as "the name, address, social security number, fingerprints, photograph, or similar information by which the identify of a patient . . . can be determined with reasonable accuracy either directly or by reference to other information."  Id. § 2.11.

As the Secretary asserts:

The Secretary does not believe any of the requested video meets the first criterion because the video does not identify patients with substance abuse disorders.  Moreover, because five of the six patient care units at Fuller Hospital are not designated to treat substance abuse patients, few if any of the videos would meet the second criterion.

(OSHA Resp. at 11).  Nevertheless, to alleviate any concerns, the Secretary has proposed that if the Respondents believe that Part 2 applies to any particular video(s), the Respondent can produce the video(s) with patient faces blurred, or, in the alternative, provide the Secretary

[12]

with an estimate for blurring the faces.  (Id.).  In addition, the Secretary has proposed entering into a protective agreement with Respondents, as it has done with UHS-DE and affiliates in other cases.  (Id.).

The Respondents contend that "Fuller Hospital has a dual diagnosis unit ("DDU") and treats patients with both psychiatric and substance use disorders."  (Resp. Opp. at 11).  They argue further as follows:

> The Secretary is also wrong about the information not being protected by Part 2 because only one out of six units is designated to treat substance use patients. Fuller Hospital's license for substance use treatment under Part 2 covers the entire hospital and not just one of its units.  There is [a] specific dual diagnosis unit but dual diagnosis patients are assigned to all other units as well. Additionally, dual diagnosis patients travel to other areas of the hospital for treatment of their substance use, such as attending therapeutic group sessions. . . .  In holding itself out to the public as treating substance use disorders, and as the whole hospital is licensed to do so, the expectation of privacy of – and protection for – substance use disorder patients extends throughout the entire hospital.

(Resp. Sur-Reply at 6).  The Respondents further claim that it would be onerous to cross-reference the videos with patient records to determine whether a video was protected and "what identifying features other than their face would need to be blurred."  Id.

The Respondents have cited no support for the proposition that the records of patients who potentially may have received substance use treatment are covered by Part 2 -- it is the reality of substance use treatment that is protected.  Nor have they made any effort to establish that the identification of patients in the videos truly is onerous.  As the Respondents themselves argue, the incidents of workplace violence are reflected in various documents maintained by Fuller.  (See Resp. Opp. at 11-12) ("For example, Fuller Hospital documents such incidents in its MIDAS system, from which it can run risk management reports or healthcare

peer review reports. Fuller Hospital tracks and trends incidents of patient aggression in monthly committee meeting minutes and dashboard data without identifying patients by name."). (See also OSHA Resp. at 2, n.4) ("Respondents can easily identify any such injuries through review of documents they already maintain, including both (a) their internal documents, such as camera debriefing forms, risk management worksheets, physical aggression reports, Sedgwick injury reports, and/or (b) their OSHA 300 and 301 logs."). Thus, it seems that the Respondents should be able to cross-reference its documents with the video surveillance without too much trouble, and should thereafter be able to identify the patients who were receiving substance use treatment. The Respondents bear the burden of demonstrating that compliance would be "*unnecessarily* burdensome." RNR Enters., Inc. v. SEC, 122 F.3d 93, 97 (2d Cir. 1997) (citation omitted). They have not met this burden.

In any event, it appears that the Secretary's proposal is eminently reasonable. If the Respondents believe that patients' faces should be blurred, it can identify those videos and work with the Secretary to determine who should pay for the blurring to be done.[6] If the Secretary believes that the Respondents are being too over-inclusive, and that he needs to be able to view the patients' faces, he can seek a further court order if the parties are unable to resolve their differences. It does not appear that the Secretary is relying on the videotapes to identify specific witnesses, although he may choose to do so. Therefore, the parties may agree

---

[6] The Respondents have expressed a concern about whether other identifying information besides a patient's face should be blurred. It is difficult to imagine that this will be a big problem in the case of videotapes of workplace violence, and the Respondents have put forth no evidence to support this alleged concern. In any event, there is no reason why the same blurring procedure cannot be applied if unique characteristics appear on the videos.

that even over-inclusive blurring is not a problem.  The parties should have the opportunity to define the parameters of any redactions.

    C. **The Time Period of the Subpoena**

The Secretary is seeking the responsive videos through the date of their actual production.  Respondents have requested that the time period for which they need to produce the videotapes be limited to the period from June 12, 2019, *i.e.* the date the Secretary opened the investigation and sent the preservation letter, to September 24, 2019, when they received the subpoena. (Resp. Opp. at 13).  The Respondents argue that the reference "'to the present' does not provide any end date to the subpoena response and is therefore overly broad and unreasonable." (Id.).  Moreover, any videos created after June 12, 2019 would be irrelevant to establishing the alleged violation that occurred "on or before June 12, 2019." (Id.).  However, it is within the Secretary's authority to subpoena the requested videos.  In addition, the Respondents have failed to establish that producing the videos through the date of production would be unduly burdensome. This court recommends that the production cover the period until a month before the date of production.[7]

As detailed in the Opinion denying Respondents' motion to dismiss, the Subpoena remained viable even if the Secretary could no longer issue additional citations for any violations that were uncovered.  As the court wrote:

> The question is whether the subpoena is now moot because the Secretary apparently cannot issue further citations for any violations uncovered by it.  But

---

[7] Some finite period is necessary to avoid disputes.  This court assumes that it will take some time to blur the faces of patients as described above, if the Respondents decide not to produce the videos without blurring, as it has done in other cases.  This court estimates that one month should be sufficient to accomplish this.

> even if that is true, the documents sought by the subpoena may have other valid uses. The Secretary may subpoena documents and witnesses as part of any investigation or inspection "to carry out the purposes" of the Occupational Safety and Health Act.  29 U.S.C. § 657.  One possible outcome of such investigations or inspections is a citation.  See 29 U.S.C. § 658.  But there are other possible consequences.  For example, the Secretary may "compile, analyze, and publish" reports and information obtained by inspection or investigation; "prescribe such rules and regulations as he may deem necessary"; or pursue injunctive relief in federal district court.  See 29 U.S.C. §§ 657(g)(1), 657(g)(2), 662.

Opinion at 4-5.

"[I]t is well settled that the commencement of civil proceedings does not terminate an administrative agency's investigative authority nor moot its administrative subpoena."  NLRB v. Bacchi, No. 04 MC 28(ARR), 2004 WL 2290736, at *4 (E.D.N.Y. June 16, 2004) and cases cited. In fact, Respondents do not challenge the Secretary's authority to seek videos beyond the date of the Subpoena, but rather contend that without a cut-off date, "Respondents would suffer the onerous obligation of maintaining and storing large amounts of data for video that does not yet exist now, did not exist at the time the subpoena [issued], and for an indefinite time into the future." (Resp. Sur-Reply at 9).  However, the Respondents elected not to produce any information in response to the Subpoena at any time since it was issued.  The fact, therefore, that months have elapsed since the initial request is not a basis for limiting the production. Moreover, the Respondents have put forth no evidence to support their contention that a search for videos beyond a three-month period would be unduly burdensome.

Finally, the Respondents have been on notice to preserve the videos since the initial preservation notice was issued.  The retention obligation was reiterated by the Subpoena and then by an order of the court.  Respondents now contend, without specifics, that the preservation letter was a mere suggestion, and that it could not be expected to understand the

[16]

types of events that are "potentially relevant" to OSHA's investigation. (Resp. Sur-Reply at 9). The procedure suggested by the Secretary would require the Respondents to identify videos they have destroyed, and this court has added the requirement that the date and circumstances of destruction be disclosed as well. It would be more appropriate to resolve the issue whether responsive videos have been wrongfully destroyed in the context of specific facts, as opposed to hypotheticals.

## IV. **CONCLUSION**

For all the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the Petition for Enforcement of Administrative Subpoena Duces Tecum be ALLOWED subject to the following procedure:

Respondents shall:

1. Identify any employee injuries within the scope of Subpoena Request 5 that occurred at Fuller Hospital between June 12, 2019 and one month before the date it is providing the information ("the present");

2. For each injury identified, determine whether any video was created of the injury's occurrence;

3. Provide the Secretary with a log listing each video that was created and stating whether it still exists or was deleted or rendered unavailable. For each video that still exists, the log should also state whether Respondents contend that Part 2 privacy concerns are implicated. For each video that was deleted or rendered unavailable, the Respondents should state the date and circumstances surrounding it becoming unavailable.

4. Produce to the Secretary the videos that exist for which no Part 2 privacy concern applies. In regard to the subset of videos to which Respondents contend a Part 2 privacy concern applies, produce the videos with patient faces blurred or, in the alternative, provide to the Secretary an estimate of what it would cost to address the alleged Part 2 privacy concern to enable production.

5. The parties shall attempt to resolve the issue of who should pay for the protective measures Respondents contend are necessary. If they are unable to do so, they may

[17]

file an appropriate motion with this court.

6. The parties may modify these procedures by agreement.[8]

/ s / Judith Gail Dein  
Judith Gail Dein  
United States Magistrate Judge

---

[8] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72, any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days after being served with this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985); accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994).